**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

2015 AUG 19 PM 4:49

OFFICE OF THE CLERK

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) ) | CRIMINAL NO. 4:14CR3136 |
|  |  | **S U P E R S E D I N G INDICTMENT** |
| v. | ) ) | 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud Affecting a Financial Institution and Securities Fraud); |
| GILBERT G. LUNDSTROM, | ) ) | 18 U.S.C. § 371 (Conspiracy to Falsify Bank Entries); |
| Defendant. | ) ) ) ) ) ) ) ) | 18 U.S.C. § 1343 (Wire Fraud Affecting a Financial Institution); 18 U.S.C. § 1348 (Securities Fraud); 18 U.S.C. § 1005 (Falsifying Bank Entries) |

The Grand Jury charges that:

## I.   RELEVANT PERSONS AND ENTITIES

### A.   TierOne Bank

1.     TierOne Bank was a commercial bank and financial institution founded in 1907 and owned by a holding company called TierOne Corporation (collectively "TierOne").

2.     TierOne was headquartered in Lincoln, Nebraska. TierOne had more than 800 employees working at its headquarters in Lincoln, Nebraska, and at its branch offices spread throughout Nebraska, Iowa, and Kansas.

3.     TierOne provided a full range of commercial and consumer banking services to businesses and individuals. In 2009, TierOne reported that it held more than $3 billion in assets, consisting primarily of real estate loans that were comprised of one-to-four family residential mortgages, commercial loans, land loans, and land-development loans.

4.      TierOne's stock was traded publicly on NASDAQ, a national securities exchange, and was registered with the United States Securities and Exchange Commission ("SEC"), an agency of the United States, pursuant to Section 12(b) of the Securities Exchange Act of 1934.

## B.  The Defendant

5.      From in or around September 1999, the defendant **GILBERT G. LUNDSTROM** served as Chief Executive Officer ("CEO") and Chairman of the Board of Directors of TierOne. As CEO, **LUNDSTROM** was the highest ranking executive at TierOne, and almost all of TierOne's employees ultimately reported to him.  In January 2010, **LUNDSTROM** resigned as CEO, but continued to serve on TierOne's Board of Directors until in or around March 2010.

## C.  The Co-Conspirators

6.      From in or around April 2002 to in or around March 2010, **JAMES A. LAPHEN** served as President and Chief Operating Officer ("COO") of TierOne.  As President and COO, **LAPHEN** was the second-highest ranking executive at TierOne, reporting directly to **LUNDSTROM**.  With the exception of **LUNDSTROM**, almost all of TierOne's employees ultimately reported to **LAPHEN**.  From in or around March 2010 to in or around June 2010, **LAPHEN** served as acting CEO of TierOne.

7.      From in or around January 2008 to in or around April 2010, **DON A. LANGFORD**, was a Senior Vice President and the Chief Credit Officer of TierOne.

## D.  TierOne's Regulators

### The Securities and Exchange Commission

8.      The SEC was an independent agency of the United States government charged by law with preserving honest and efficient markets in securities. The federal securities laws,

regulations, and rules were designed to ensure that the financial information of publicly traded companies was accurately recorded and disclosed to the investing public.

9.      As a public company, TierOne and its directors, officers, and employees were required to comply with the federal securities laws, regulations, and rules, and to make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflected the transactions and disposition of the assets of TierOne.

10.     TierOne was also required to file annual reports ("SEC Forms 10-K") and quarterly reports ("SEC Forms 10-Q") with the SEC that contained audited financial statements that accurately and fairly presented the financial condition of TierOne, as well as other reports that contained information about TierOne's management, Board of Directors, business operations, and performance.  Through these reports, TierOne disclosed its financial information to the SEC, TierOne's shareholders, and the investing public.  A public accounting firm acted as the external auditor of TierOne's annual financial statements and reviewed TierOne's quarterly financial statements.

11.     As CEO of TierOne, **LUNDSTROM** signed certifications filed with the SEC attesting that, among other things, (a) based on his knowledge, TierOne's reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements, in light of the circumstances under which the statements were made, not misleading; (b) based on his knowledge, TierOne's reports fairly presented, in all material respects, the financial condition of TierOne; and (c) he had disclosed any fraud, whether or not material, involving management or other employees who had a significant role in TierOne's internal controls over financial reporting.

12. TierOne also disclosed its financial information to its shareholders and the investing public through other means, including through press releases, shareholder meetings, and earnings announcements.

<u>The Office of Thrift Supervision</u>

13. The Office of Thrift Supervision ("OTS") was an agency of the United States charged with supervising and regulating federally-chartered banks and savings and loan associations. In addition to being regulated by the SEC, TierOne was also regulated by the OTS.

14. Under the federal bank laws, regulations, and rules, TierOne was required to disclose its financial information to the OTS and to the public through the quarterly filing of reports ("Thrift Financial Reports") that accurately and fairly presented the financial condition of TierOne. In addition to receiving information about TierOne through Thrift Financial Reports, the OTS also gathered information about TierOne through examinations conducted on-site at TierOne's headquarters in Lincoln, Nebraska. As TierOne's primary federal bank regulator, the OTS had the authority to examine and assess TierOne's financial condition through both comprehensive examinations, which were scheduled annually, and special examinations, which could be scheduled at various times throughout the year. During the OTS's regularly scheduled comprehensive examinations and special examinations, TierOne and its directors, officers, and employees were required to report accurate and truthful information about TierOne's financial condition in response to inquiries from the OTS's examiners.

15. As TierOne's primary federal bank regulator, the OTS was also responsible for reviewing any application TierOne submitted under the United States Treasury Department's Troubled Asset Relief Program ("TARP"). TARP was created by the Emergency Economic Stabilization Act of 2008 and was designed, among other things, to restore liquidity and stability

4

to the financial system in the wake of the financial crisis. One of the sub-programs created under TARP was the Capital Purchase Program, in which government funds would be invested in financial institutions in exchange for preferred shares in those institutions. Financial institutions seeking TARP funds under the Capital Purchase Program would apply for government funds through their primary federal bank regulator, and both an institution's eligibility and the amount of the Capital Purchase Program investment would depend, in part, upon information reflected in the institution's financial statements.

16.    On or about November 13, 2008, TierOne filed an application with the OTS requesting approximately $80 million in government funds through the Capital Purchase Program. In or around April 2009, and again in or around May 2009, the OTS informed **LUNDSTROM** that TierOne's application for $80 million in funds would be denied. On or about May 11, 2009, **LUNDSTROM** sent a letter to the OTS withdrawing TierOne's TARP application.

## II.    TIERONE'S EXPANSION THROUGH "TURBO ASSETS"

17.    TierOne had historically focused on residential and agricultural loans in the Midwest, including in Nebraska, Iowa, and Kansas. However, beginning in or around 2002 and continuing through 2006, TierOne implemented a new strategy to grow the bank's loan portfolio through investments in "TURBO Assets," which TierOne defined as higher-yielding assets, including commercial real estate loans and construction loans. As part of TierOne's "TURBO Asset" growth strategy, TierOne began to offer loans in geographical areas outside of its traditional lending areas, and opened loan production offices in, among other states, Nevada, Florida, Arizona, and North Carolina. TierOne's new loan production offices generated

5

hundreds of new loans, which were entered into with residential real estate developers, among others.

18.     The loans that TierOne made through its new loan production offices helped TierOne to grow its loan portfolio and other assets by billions of dollars.  When TierOne first offered stock as a public company in 2002, TierOne reported assets of approximately $1.5 billion.  By the end of 2007, TierOne had increased its assets to approximately $3.5 billion.

19.     While initially TierOne's "TURBO Asset" growth strategy appeared successful, in or around 2006, the real estate markets in some of TierOne's new lending territories began to decline.  Many of TierOne's borrowers were dependent on selling real estate to pay back the money they had borrowed from TierOne.  As a result, the financial condition of a significant number of TierOne's borrowers deteriorated.

### III.     TIERONE'S LOAN LOSS ALLOWANCE

#### A. Estimates of Losses on Loans

20.     If TierOne believed that it was not going to collect the entire loan balance from a borrower under the original terms of the loan, TierOne was required to report that loss estimate as part of the quarterly and annual financial information TierOne submitted to the SEC and to the OTS (commonly referred to as a "reserve").  In order to make a good faith estimate of losses on a loan, TierOne was required to take into account available information about the loan, including the value of the underlying collateral, which was typically the property under development, and the facts and circumstances surrounding the borrower's financial condition.

21.     The total amount of the losses TierOne estimated that it would incur in its loan portfolio was reported to the SEC and to the OTS as TierOne's "Allowance for Loan and Lease Losses," "Loan Loss Allowance," or "ALLL."

### B. Estimates of Losses on Real Estate

22.     When TierOne acquired real estate through foreclosure, TierOne was required to report the value of the real estate as part of the quarterly and annual financial information TierOne submitted to the SEC and to the OTS (commonly reported as "Other Real Estate Owned" or "OREO"). If TierOne believed that its OREO portfolio had decreased in value, TierOne was required to either write down the value of the OREO or include the amount of the decrease in value as part of TierOne's Loan Loss Allowance.

23.     Any increase in TierOne's Loan Loss Allowance indicated that the bank's loan portfolio and real estate portfolio was deteriorating and also adversely impacted TierOne's assets and earnings. Similarly, any decrease in the value of TierOne's real estate portfolio also adversely impacted TierOne's assets and earnings. For that reason, TierOne's good faith estimates of losses in its loan portfolio and good faith estimates of the value of its real estate portfolio were material to TierOne's regulators and the investing public in evaluating TierOne's financial condition.

### IV.     TIERONE'S CAPITAL RATIOS AND SUPERVISORY AGREEMENT

24.     In or around April 2008, the OTS commenced a special examination of TierOne. After the special examination, the OTS informed **LUNDSTROM** and others at TierOne that the OTS was very concerned with, among other things, both the deterioration of TierOne's asset quality and the decrease in TierOne's capital. In or around June 2008, the OTS directed TierOne to infuse additional capital into TierOne and to maintain a minimum capital position in relation to its loan portfolio and other assets of 8.5% (commonly reported as a "Core Capital Ratio").

25.     In or around June 2008, the OTS commenced its annual comprehensive examination of TierOne. In or around October 2008, the OTS issued its Report of Examination,

which contained findings and conclusions from the June 2008 annual comprehensive examination.  In its Report of Examination, the OTS reported to TierOne that, among other things, the OTS had found: (a) that TierOne's credit underwriting, documentation, and administration practices were deficient; (b) instances where TierOne had overstated income and deferred the timely recognition of losses; and (c) loans where the underlying collateral was not appraised, or where the appraisals were stale.   The OTS also expressed concern that while TierOne was compliant with the 8.5% mandated Core Capital Ratio as of June 2008, in light of the deterioration in TierOne's asset quality, TierOne might not be able to meet the minimum Core Capital Ratio of 8.5% going forward.

26.   Based on the findings and conclusions set forth in the Report of Examination, in or around January 2009, the OTS executed a Supervisory Agreement with TierOne.   The Supervisory Agreement required, among other things, that TierOne (a) take additional steps to ensure that its Loan Loss Allowance was being accurately calculated; (b) report additional information to the OTS about TierOne's performance and financial condition, including preparing and submitting a detailed Loan Loss Allowance report to the OTS; (c) provide the OTS with complete and accurate minutes of Board of Directors meetings; (d) provide the OTS with a Corporate Governance Report evaluating the performance of **LUNDSTROM** and other senior executives, which was to be prepared only by TierOne's "Outside Directors;" and (e) continue to maintain a minimum Core Capital Ratio of 8.5%.

## V.      THE SCHEME TO DEFRAUD

### A. Overview of the Scheme

27.      From in or around at least 2008 and continuing through in or around at least June 2010, **LUNDSTROM** and others, known and unknown, devised, intended to devise, and executed a scheme to (a) defraud TierOne's shareholders and the investing public, and (b) mislead TierOne's external auditors and regulators, by making and causing others to make false and misleading statements about TierOne's financial condition.

### B. Purpose of the Scheme

28.      The purpose of the scheme was for **LUNDSTROM** and his co-conspirators to conceal TierOne's true financial condition, including the amount of the losses in TierOne's loan and real estate portfolios, from TierOne's shareholders, regulators, external auditors, and the investing public in order to: (a) forestall adverse regulatory action against TierOne; (b) maintain and increase the market price of TierOne's stock; and (c) enrich **LUNDSTROM** and others through the continued receipt of compensation and other benefits from TierOne.

### C. Concealing Internal Estimates Showing That TierOne Needed to Increase its Reserves and Loan Loss Allowance

29.      In or around February 2009, **LUNDSTROM** asked his co-conspirators to prepare a global estimate of the amount of losses in TierOne's loan portfolio. The analysis, which was provided to **LUNDSTROM** and others, indicated that TierOne needed additional reserves to cover losses in its loan portfolio of approximately $65 million.

30.      In or around April 2009, **LUNDSTROM** directed his co-conspirators to create a more detailed analysis of losses in TierOne's loan portfolio by breaking the losses down by individual loan. When the more detailed analysis was completed, it again showed that TierOne required substantial additional reserves to cover losses in TierOne's loan portfolio. The

completed analysis, entitled "Potential Reserve Additions Needed Due to Timing of New Appraisals, Etc.", estimated that TierOne needed additional reserves in the range of $34 million in the "best case" to $112 million in the "worst case," with an "expected case" showing that TierOne needed approximately $59 million in additional reserves to cover losses in TierOne's loan portfolio. In or around April 2009, the completed analysis was provided to **LUNDSTROM** and others.

31.   In or around May 2009, **LUNDSTROM's** co-conspirators updated the detailed loan by loan analysis. The updated analysis estimated that TierOne needed additional reserves in the range of $36 million as the "best case" to $114 million as the "worst case," with an "expected case" showing that TierOne needed approximately $60 million in additional reserves to cover losses in TierOne's loan portfolio. In or around May 2009, the updated analysis was provided to **LUNDSTROM** and others.

32.   Even though the analyses **LUNDSTROM** received in or around February 2009, in or around April 2009, and in or around May 2009, all showed that TierOne needed to increase its reserves and Loan Loss Allowance by at least $30 million in the "best case" to cover additional losses in TierOne's loan portfolio, **LUNDSTROM** and his co-conspirators did not report that information to TierOne's shareholders, regulators, external auditors, or the investing public. Because **LUNDSTROM** and his co-conspirators did not increase TierOne's Loan Loss Allowance to account for the additional losses, **LUNDSTROM** and his co-conspirators caused TierOne to make statements and issue reports to the SEC, the OTS and the investing public about TierOne's financial condition that were materially false.

### E. **Concealing TierOne's Deteriorating Financial Condition**

33.     Throughout 2008 and 2009, **LUNDSTROM** and his co-conspirators concealed losses in TierOne's loan and real estate portfolio from TierOne's shareholders, regulators, external auditors, and the investing public.

34.     Rather than obtain new appraisals to substantiate the value of the collateral supporting TierOne's loan portfolio and the value of TierOne's real estate portfolio, **LUNDSTROM** and his co-conspirators directed, and caused others to direct, TierOne employees to not order new appraisals even when existing appraisals were stale and no longer reflected the true value of TierOne's loan collateral and real estate.  In some cases, when appraisals were ordered and received by TierOne, and the appraised value indicated a lower value for loan collateral or real estate in TierOne's portfolio than what TierOne had recorded, **LUNDSTROM** and his co-conspirators caused TierOne to reject the appraisal in order to avoid having to recognize the loss.

35.     **LUNDSTROM** and his co-conspirators also restructured loan terms to disguise a borrower's inability to make timely interest and principal payments.  In some cases, **LUNDSTROM** and his co-conspirators caused TierOne to advance additional funds to delinquent borrowers so that, in part, the borrower could use the additional funds to make interest payments back to TierOne.  **LUNDSTROM** and his co-conspirators also understated the risk ratings of certain loans, when an increase in the risk rating of the loan would require that TierOne record an additional loss.

36.     In or around May 2009, **LUNDSTROM** made false and misleading statements during TierOne's Annual Meeting of Shareholders about TierOne's financial condition,

including statements that were designed to mislead TierOne's shareholders, employees and the investing public about TierOne's available capital.

37.     In or around July 2009, during the course of preparing TierOne's financial statements for the April, May and June 2009 financial reporting period, **LUNDSTROM** and his co-conspirators learned that even though they were actively concealing losses in TierOne's loan and real estate portfolio, TierOne's Core Capital Ratio had still fallen below the 8.5% minimum threshold mandated by the OTS.  After learning that TierOne's Core Capital Ratio had fallen below the 8.5% minimum threshold mandated by the OTS, **LUNDSTROM** and his co-conspirators made adjustments to TierOne's financial statements for the purpose of maintaining the 8.5% Core Capital Ratio.

### F.  <u>False and Misleading Financial Reports Submitted to TierOne's Regulators</u>

38.     **LUNDSTROM** and his co-conspirators made materially false, misleading, and fraudulent statements, and caused others to make materially false, misleading, and fraudulent statements, in TierOne's Forms 10-Q filed with the SEC, TierOne's Thrift Financial Reports filed with the OTS, and other reports and financial information submitted to the OTS pursuant to the January 2009 Supervisory Agreement about:  (a) the value of TierOne's loan and real estate portfolios; (b) the amount of TierOne's reserves and Loan Loss Allowance; (c) whether TierOne had met or exceeded the 8.5% minimum Core Capital Ratio mandated by the OTS; and (d) TierOne's practices with respect to ordering appraisals and calculating the Loan Loss Allowance.

### G.  <u>Misrepresentations to the OTS During the 2009 Examination</u>

39.     In or around August 2009, the OTS returned to TierOne's headquarters in Lincoln, Nebraska, to conduct a special examination.  In or around October 2009, the OTS again returned to TierOne's headquarters to conduct a regularly scheduled annual examination.  As a

result of the OTS's findings during these examinations, the OTS became concerned that TierOne had engaged in practices designed to avoid recognizing losses in its loan and real estate portfolios, and that these practices had caused TierOne to misstate its reserves and Loan Loss Allowance.

40.     In an attempt to understand why TierOne's reserves and Loan Loss Allowance appeared to be misstated, in or around August 2009 through November 2009, the OTS made a number of requests for additional information from TierOne, including an explanation from TierOne's management as to why losses in TierOne's loan and real estate portfolios had not been recorded in a timely manner.

41.     In response to these requests from the OTS, **LUNDSTROM** and his co-conspirators made false and misleading statements to the OTS, and caused others to make false and misleading statements to the OTS in written responses submitted to the OTS and signed by **LUNDSTROM**, as well as in responses to questions posed by the OTS examiners during face-to-face meetings.

## H. The Victims

42.     Between in or about January 2008 and June 2010, TierOne's shareholders held more than 18 million shares of TierOne stock.

43.     On November 5, 2009, TierOne reported for the first time an additional loan loss provision of approximately $120 million for the three months ending September 30, 2009.

44.     After reporting the additional loan loss provision, on or about June 4, 2010, TierOne was closed by the OTS, and the Federal Deposit Insurance Corporation ("FDIC") was named Receiver.

45.     On or about June 24, 2010, TierOne filed for bankruptcy, and TierOne's stock was subsequently delisted from trading on the NASDAQ stock exchange.

## VI.   THE CHARGES

### COUNT I

**Conspiracy to Commit Wire Fraud Affecting a Financial Institution and Securities Fraud**
**(18 U.S.C. § 1349)**

46.     Paragraphs 1 through 45 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

47.     From in or around at least 2008 and continuing through in or around at least June 2010, in the District of Nebraska and elsewhere, **GILBERT G. LUNDSTROM**, did knowingly and intentionally conspire and agree with other individuals known and unknown, to commit certain offenses against the United States, namely:

   a.     wire fraud, that is, knowingly and with an intent to defraud, devise and intend to devise a scheme and artifice to defraud affecting a financial institution, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made; and for the purpose of executing the scheme and artifice, knowingly transmit and cause certain wire communications to be transmitted in interstate and foreign commerce, in violation of Title 18, United States Code, Section 1343;

   b.     securities fraud, that is, knowingly and intentionally executing and attempting to execute a scheme and artifice to defraud persons in connection with securities issued by TierOne, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, money and property in connection with the purchase and sale of securities issued by TierOne, an issuer with a class of securities registered under

15

Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), in violation of Title 18, United States Code, Section 1348.

All in violation of Title 18, United States Code, Section 1349.

## PURPOSE OF THE CONSPIRACY

48.     The Grand Jury realleges and incorporates by reference Paragraph 28 of this Superseding Indictment as a description of the purpose of the conspiracy.

## MANNERS AND MEANS OF THE CONSPIRACY

49.     The Grand Jury realleges and incorporates by reference Paragraphs 29 through 41 of this Superseding Indictment as a description of the manner and means of the conspiracy.

## COUNT II

### Conspiracy to Falsify Bank Entries
### (18 U.S.C. § 371)

50.     Paragraphs 1 through 45 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

51.     From in or around at least 2008 and continuing through in or around at least June 2010, in the District of Nebraska and elsewhere, **GILBERT G. LUNDSTROM,** did knowingly and intentionally conspire and agree with other individuals known and unknown, to commit certain offenses against the United States, namely:

a.  making false entries in a bank's books, reports, or statements, that is, knowingly and willfully making false entries in TierOne's books, reports, or statements with the intent to deceive the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of TierOne, in violation of Title 18, United States Code, Section 1005.

All in violation of Title 18, United States Code, Section 371.

16

## PURPOSE OF THE CONSPIRACY

52.     The Grand Jury realleges and incorporates by reference Paragraph 28 of this Superseding Indictment as a description of the purpose of the conspiracy.

## MANNERS AND MEANS OF THE CONSPIRACY

53.     The Grand Jury realleges and incorporates by reference Paragraphs 29 through 41 of this Superseding Indictment as a description of the manner and means of the conspiracy.

## OVERT ACTS

54.     In furtherance of the conspiracy and to achieve its objects and purposes, at least one of the co-conspirators performed or caused to be performed, in the District of Nebraska and elsewhere, the following overt acts, among others:

55.     Under TierOne's Supervisory Agreement with the OTS, TierOne was required to provide the OTS with a Corporate Governance Report evaluating the performance of **LUNDSTROM** and other senior executives.   The Supervisory Agreement required that the Corporate Governance Report be prepared solely by TierOne's "Outside Directors" and not by **LUNDSTROM**.  In or around March 2009, **LUNDSTROM** received the final version of the Corporate Governance Report.    After reviewing the Corporate Governance Report, **LUNDSTROM** caused TierOne to make significant changes to the Corporate Governance Report prior to its submission to the OTS.

56.     In or around May 2009, **LUNDSTROM** directed a TierOne employee to omit from the minutes of a TierOne Board of Directors meeting references to a presentation made by **LUNDSTROM's** co-conspirators of an internal analysis entitled "Potential Reserve Additions Needed Due to Timing of New Appraisals, Etc." that showed TierOne needed additional reserves in the range of $36 million as the "best case" to $114 million as the "worst case," with an

17

"expected case" showing that TierOne needed approximately $60 million in additional reserves to cover losses in TierOne's loan portfolio.

57.    On or about June 26, 2009, **LUNDSTROM** and others caused TierOne to transmit to the OTS minutes of a TierOne Board of Directors meeting that had been altered to remove references to a presentation made by **LUNDSTROM's** co-conspirators of an internal analysis entitled "Potential Reserve Additions Needed Due to Timing of New Appraisals, Etc." that showed TierOne needed additional reserves in the range of $36 million as the "best case" to $114 million as the "worst case," with an "expected case" showing that TierOne needed approximately $60 million in additional reserves to cover losses in TierOne's loan portfolio.

58.    On or about July 30, 2009, **LUNDSTROM** and his co-conspirators caused TierOne to file a Thrift Financial Report with the OTS that misrepresented TierOne's financial condition and performance.

59.    On or about August 28, 2009, **LUNDSTROM** and his co-conspirators caused TierOne to file a report that misrepresented TierOne's Core Capital Ratio and its compliance with TierOne's Supervisory Agreement with the OTS.

60.    On or about October 2, 2009, the OTS submitted to TierOne a number of questions regarding TierOne's methodology for calculating loss estimates on TierOne's nonperforming loans.  On or about October 15, 2009, in response to the OTS's inquiry, **LUNDSTROM** and his co-conspirators did not provide the OTS with the loan-by-loan loss estimates prepared earlier in 2009 entitled "Potential Reserve Additions Needed Due to Timing of New Appraisals, Etc." that showed TierOne needed to increase its reserves and Loan Loss Allowance.  Instead, **LUNDSTROM** and his co-conspirators falsely claimed that no such loan-

by-loan loss analysis existed, and that TierOne's "[n]onperforming loans were not broken down by individual loan category."

61.     On or about December 18, 2009, **LUNDSTROM** and his co-conspirators caused TierOne to file a response to the OTS that misrepresented TierOne's lending and management practices.

All in violation of Title 18, United States Code, Section 371.

## COUNTS III THROUGH VI

### Wire Fraud Affecting a Financial Institution
### (18 U.S.C. §§ 1343 and 2)

62.     Paragraphs 1 through 45 and 54 through 61 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

63.     From at least 2008, the exact date being unknown to the Grand Jury, through June 2010, in the District of Nebraska and elsewhere, **GILBERT G. LUNDSTROM**, aided and abetted by others known and unknown to the Grand Jury, did knowingly and with an intent to defraud, devise and intend to devise a scheme and artifice to defraud affecting a financial institution, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made; and for the purpose of executing the scheme and artifice, did knowingly transmit and cause certain wire communications to be transmitted in interstate and foreign commerce.

### PURPOSE OF THE SCHEME AND ARTIFICE TO DEFRAUD

64.     The Grand Jury realleges and incorporates by reference Paragraph 28 of this Superseding Indictment as a description of the purpose of the scheme.

19

## THE SCHEME AND ARTIFICE TO DEFRAUD

65.     The Grand Jury realleges and incorporates by reference Paragraphs 29 through 40 of this Superseding Indictment as a description of the scheme.

## USE OF THE WIRES

66.     On or about the dates specified as to each count below, **LUNDSTROM**, in the District of Nebraska and elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, as more particularly described below:

| Count | Approximate Date | Description of Wire Communication |
|---|---|---|
| 3 | July 30, 2009 | Electronic transmission of a Thrift Financial Report from TierOne in Nebraska to various states |
| 4 | August 7, 2009 | Press release from TierOne issued from Nebraska to various states through the national press service |
| 5 | September 4, 2009 | Press release from TierOne issued from Nebraska to various states through the national press service |
| 6 | September 4, 2009 | Electronic mail from **LUNDSTROM** in Nebraska sent to TierOne employees located in various states |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT VII

### Securities Fraud
### (18 U.S.C. §§ 1348 and 2)

67.     Paragraphs 1 through 45 and 54 through 61 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

68.     From at least 2008, the exact date being unknown to the Grand Jury, through June 2010, in the District of Nebraska and elsewhere, the defendant, **GILBERT G. LUNDSTROM**, aided and abetted by others known and unknown to the Grand Jury, did knowingly and

intentionally execute a scheme and artifice (a) to defraud any person in connection with any security of TierOne, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, any money and property in connection with the purchase and sale of any security of TierOne, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), to wit, **LUNDSTROM** and others made, and caused to be made, false and misleading representations to TierOne's shareholders and members of the investing public about TierOne's true financial condition.

| Count | Approximate Date | Description of Event |
|-------|------------------|----------------------|
| 7 | August 10, 2009 | SEC Form 10-Q for Second Quarter 2009 |

In violation of Title 18, United States Code, Sections 1348 and 2.

## COUNTS VIII THROUGH XIII

### False Entries in a Bank's Books, Reports, or Statements
### (18 U.S.C. §§ 1005 and 2)

69.    Paragraphs 1 through 45 and 54 through 61 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

70.    From at least September 2008, the exact date being unknown to the Grand Jury, through June 2010, in the District of Nebraska and elsewhere, **GILBERT G. LUNDSTROM**, aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully make false entries in TierOne's books, reports, or statements with the intent to deceive the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of TierOne, as more particularly described below:

21

| Count | Approximate Date | Description of False Entry or Statement |
|---|---|---|
| 8 | May 21, 2009 | Minutes of TierOne Board of Directors meeting, signed by **LUNDSTROM** |
| 9 | July 30, 2009 | Thrift Financial Report filed with the OTS |
| 10 | August 28, 2009 | TierOne report on capital submitted to the OTS |
| 11 | September 2, 2009 | TierOne management response submitted to the OTS, signed by **LUNDSTROM** |
| 12 | October 15, 2009 | TierOne management response submitted to the OTS, signed by **LUNDSTROM** |
| 13 | December 18, 2009 | TierOne management response submitted to the OTS, signed by **LUNDSTROM** |

All in violation of Title 18, United States Code, Sections 1005 and 2.

## FORFEITURE ALLEGATION

71.     As a result of conspiring to commit wire fraud, securities fraud, and making false bank entries, and committing wire fraud, securities fraud, and making false bank entries, in violation of Title 18, United States Code, Sections 1349, 371, 1343, 1348, and 1005, as alleged in Counts One through Thirteen of this Superseding Indictment, **GILBERT G. LUNDSTROM**, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all real property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Thirteen of this Superseding Indictment.

### Substitute Asset Provision

72.     If any of the above described forfeitable property, as a result of any act or omission of the defendants:

   1)     cannot be located upon the exercise of due diligence;

   2)     has been transferred or sold to, or deposited with, a third person;

   3)     has been placed beyond the jurisdiction of the Court;

   4)     has been substantially diminished in value;

22

5)   or has been commingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States

Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value

of the above forfeitable property.

Title 18, United States Code, Sections 981; Title 28, United States Code, Section 2461.


A TRUE BILL:



FOREPERSON


ANDREW WEISSMANN
Chief
Fraud Section, Criminal Division
U.S. Department of Justice

By:    Henry P. Van Dyck
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice

By:    L. Rush Atkinson
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice


23